## BOYLE v. SPRINGFIELD LIFE INSURANCE CO.

No. 68-2931.

Circuit Court, Broward County.

March 21, 1972.

Francis D. O'Connor and Harry G. Carrott of Morgan, Carrott & O'Conner, Fort Lauderdale, for the plaintiff.

Francis A. C. Sevier of Stephens, Magill, Thornton & Sevier, Miami, for the defendant.

LAMAR WARREN, Circuit Judge.

*Final judgment:* This cause involves the construction of an insurance policy insuring against loss resulting from "sickness" of any covered dependent contracted and commencing while the policy·

was in force, the term "eligible dependent" including any unmarried child between the ages of 14 days and 23 years inclusive and dependent upon the insured.

Plaintiff filed his complaint against the defendant insurance company alleging that after the issuance of a policy of insurance a child was born to plaintiff, who was covered under the policy as a dependent; that a claim for medical expenses was filed which was rejected on the ground that the condition requiring medical attention was congenital, and therefore excluded under a policy provision excluding coverage until the child reached 14 days of age, and plaintiff requested a judgment declaring his rights under the policy.

In its answer, defendant generally denied the allegations of the complaint, and alleged that there was no coverage for the child for the loss claimed because he did not become a covered dependent until he reached the age of 14 days, and that he was diagnosed as having a congenital transposition of the great vessels of the heart, a congenital heart disease.

The defendant issued the policy on June 2, 1965, the application attached to the policy showing that insured's wife was at the time approximately six months pregnant, and on July 5, 1965, the pregnancy resulted in the birth of a boy. On July 7th the attending physician, according to his deposition, noted that the baby appeared dusky (cyanotic) while crying and he decided that the baby had something wrong with his heart, a congenital heart defect, the duskiness implying to him that there was a cardiac condition that was not supplying enough blood to the skin on exertion; that he called for a consulting cardiologist, Dr. Regina Gluck, whose critical impressions were that of truncus arteriosus or Taussing transposition, with which impressions the witness agreed; that cardiograms taken on July 5th and July 8th were abnormal, that the progress notes showed that the condition on discharge to home on July 10th was fair to poor, and on the face sheet of the chart, unimproved; that on July 15th, when he next saw the child after discharge, he noted cyanosis when crying, but the rest of the examination was negative, and he next saw the child on August 12th, although he received Dr. Gluck's letter to him of August 4th and might have been in discussion with her; that Dr. Gluck and he had decided that the baby had a congenital defect, and they recommended that after discharge that the cardiac condition be followed up; he told the mother that the baby had a serious congenital heart defect and that a cardiac study should be done, but not at this time, and he advised the mother to treat him normally; and that Dr. Gluck and he concurred in referring the child to a specialist in Texas, who undertook surgical procedures on September 1, 1965.

Dr. Gluck, the cardiac consultant, testified by way of deposition that she first saw the baby on July 8, 1965, and she thought that he had a congenital cardiac defect, which was satisfactory, and that the baby should be discharged, with a re-evaluation of its cardiac status in a month; she noted it had some mild cyanosis and the original x-ray gave the impression that there was enlargement of the heart. Her diagnosis on discharge on July 10, 1965, was congenital cardiac anomaly probably truncus arteriosos, however, in an August 9th letter she stated the baby probably had a transposition of the great vessels of the Taussig-Bing type, because she had seen the baby on August 2nd and there had been a change, increased blueness, in the baby's condition which did not "embarass" the child; the circulation was compensated for, so the baby's cardiac status was satisfactory. The baby was not in cardiac failure and was not having any problems such as feeding, and that was what she meant by "embarassing." Tests on August 18th confirmed her earlier diagnosis of transposition, but there never was an emergency that required surgery right then and there. On September 1st elective palliative surgery, to help the condition, was performed in Texas. Thereafter, the witness saw the child on an intermittent basis without any problems until January, 1967, when secondary surgery was performed, and she saw him on a regular basis until further surgery in September, 1968, which was also successful. In May, 1971, he received a conversion procedure, and the child was again all right.

On August 4, 1965, Dr. Gluck wrote (letter attached to her deposition) the attending physician that on August 2nd, at the time of a cardiac checkup, the mother reported that he had been well, taking his formula as well as solid food readily; that although his blueness had increased, the respirations were normal, and he had been noticed to perspire a good deal with activity. The witness at that time found the infant well nourished, cyanosis increased with crying, respirations normal, heart enlarged on percussion, no evidence of cardiac failure, and she did not consider it necessary to repeat the fluoroscopic examination or the electrocardiogram. After noting a considerable increase in cyanosis, and changing her diagnosis, she believed prognosis was poor and that it was likely the infant would develop cardiac failure, so she advised cardiac studies to make a definite diagnosis.

She further testified that the three heart defects which she considered, truncus, tetralogy, and transposition, usually would get a child into trouble, but it might be years, depending on the individual. When she originally saw the baby she did not think it was worth doing the cardiac studies because she was not concerned about the baby.

The mother testified that during the first month of the child's life he ate well, and did not turn blue except when he cried. He slept well and reacted normally. He had no problems that required her to consult a physician, the only time being for the normal checkup after ten days, which was a routine visit. Subsequently, the child was taken to Texas for surgery and the bills, for which claim had been made, were rejected. During the first thirty days after birth he was not on medication and was not restricted in any way; he had no problems, other than he turned a little bit blue when he cried.

A consultant cardiologist, testifying for the defendant, stated that overall mortality in complete transposition was over 90 per cent the first six months; that the most common cause seen in the first month was blueness or cyanosis; that this child's heart was markedly impaired, that he placed the child in the most restrictive classification as to capability of people with heart disease, in view of his symptoms on less than ordinary exertion for his age; that he had not read the depositions of Dr. Gluck or the attending physician; and as to whether he would have expected the child to expire in six months, he stated that the statistical chance roughly was 90 per cent within the first six months.

The partial factual chronology is that the child was born on July 5, 1965; Dr. Gluck's first contact with the baby was on July 8th; the baby was discharged from the hospital on July 10th; it was 14 days old on July 18th (the exclusionary period under the policy); it was brought back for a cardiac checkup by Dr. Gluck on August 2nd, when she changed her mind and made her first diagnosis of Taussig-Bing transposition due to a change in the baby's condition of increased blueness; cardiac studies were done August 18th, which confirmed the diagnosis of transposition but of a different type; and the first operation in Texas was done on September 1, 1965.

From the briefs of the parties it appears that from the plaintiff's point of view the question is whether the policy involved covers a child who was diagnosed and treated after reaching the age of 14 days, as having a congenital condition; or, as the defendant states it, whether or not the infant had a "sickness" which was "contracted and commenced" during the time the policy was in force as to him.

It will be recalled that the policy insured against loss resulting from "sickness" of a covered dependent, such a dependent including an unmarried child between the ages of 14 days and 23 years inclusive.

The principle applicable to this case is found in 53 ALR2d, *Insurance — Inception of Sickness* §3, p. 689, as follows — "It is

generally recognized that the provisions in a health or hospital insurance policy requiring that the illness or disease from which the assured suffers originate a specified time after the date of the policy to be within the policy coverage are strictly construed against the insurer, and the illness, disease, or disability will ordinarily be deemed to have its inception when it first becomes manifest or active or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease." See also *Couch on Insurance 2d,* §41:814, and Appleman 1A, *Insurance Law and Practice* §406.

In Couch it is said, "In consequence of the distinction between 'sickness' and 'disease,' there is coverage under a 'sickness' policy of a 'sickness' which first manifests itself during the period of the policy even though it is traceable to a diseased condition which antedated the policy, absent any element of fraud or breach of warranty or condition, etc., which would make the policy void or voidable. That is, it is generally recognized that provisions in a health or hospital insurance policy requiring that the illness or disease from which the insured suffers originate a specified time after the date of the policy to be within the policy coverage are strictly construed against the insurer, and the illness, disease, or disability will ordinarily be deemed to have its inception when it first becomes manifest or active, or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease."

In Continental Casualty Company v. Gold, Fla., 194 So.2d 272, upon which both parties rely, the jury, which had been presented with conflicting evidence as to when the condition causing hospitalization first became manifest, found in favor of the claimant. The Supreme Court in affirming was inclined to believe that the weight of authority supported the trial court's instruction to the jury, which was to the effect that one is regarded as sick only when his diseased condition has advanced far enough to incapacitate him. In that case the court stated at page 275 —

In 29 Am.Jur., Insurance, §1154, 301, the text reads:

"The words 'sickness' and 'disease' are technically synonymous, but when given the popular meaning as required in construing a contract of insurance, 'sickness' is a condition interfering with one's usual activities, whereas disease may exist without such result; in other words, one is not ordinarily considered sick who performs his usual occupation, though some organ of the body may be affected, but is regarded as sick when such diseased condition has advanced far enough to incapacitate him." We believe this is the general rule that governs this case; it supports the trial judge's ruling. The insurer could have protected itself in the terms of the policy in this particular had it deemed it advisable, by limiting its

liability solely to a "disease" orignatng after a certain time stated in the policy or by stipulating that it did not cover "sickness" whose symptoms appeared prior to the effective date of the policy. This it did not do. It used the term "sickness" interchangeably with "disease" in respect to the time of its liability and, as we have seen, this word connotes incapacitation to perform one's usual occupation. See again 29 Am.Jur., Insurance, §1154, page 301, to the effect that in a situation of this kind the construction of the policy should favor the insured. The text there reads in part:

> "In determining what losses are covered by policies insuring against losses on account of disease or sickness, the general rule that ambiguous or uncertain provisions will be construed most favorably to the insured is applied. * * *"

The court believes that the facts herein come within the *Gold* case above.

While Dr. Gluck on July 8, 1965, found a congenital cardiac defect, it was satisfactory, and the child was discharged to its home two days later, he having mild cyanosis at the time. On July 15th, when the examining physician next saw the child after its discharge, which was within a few days of the 14 days inclusive period under the policy, there was noted cyanosis on crying, but the rest of the examination was negative.

According to the mother, during his first month the child ate and slept well, reacted normally, was not on medication or restricted, and had no problems, other than turning a little blue when he cried.

It was well after 14 days from the child's birth that Dr. Gluck found the change in the child of considerably increased blueness on August 2nd, which led her to change her diagnosis from truncus arteriosos to transposition, to find that prognosis was poor and that it was likely that the infant would develop cardiac failure, and to suggest cardiac studies which, when she originally saw the baby, she did not think worth doing because she was not concerned about the baby. And it was the result of the cardiac studies on August 18th, confirming transposition, which induced the reference by her to the specialist in Texas. These facts brought the matter within the *Gold* case and the general statements of the law as found in ALR2d and Couch above. The sickness under the policy became active and a distinct changed condition appeared from which the heart specialist could diagnose the disease; the condition had commenced and had advanced far enough to incapacitate the child.

The court therefore finds that the child of the plaintiff was a dependent covered by the policy and that the plaintiff is entitled to be compensated for the medical expenses rendered to said child

within the provisions of said policy, and it is adjudged that judgment be and the same is entered for the plaintiff, the court retaining jurisdiction to ascertain the amount of said medical expenses, plaintiff's attorneys' fees, and costs.